# IN THE COURT OF APPEALS OF TENNESSEE,
## AT JACKSON

_____

|  |  |  |
|---|---|---|
| **JOSEPH EDMUND STEPHENSON and NORMA NUNN STEPHENSON**, | ) ) ) | Shelby County Circuit Court No. 155831 R.D. |
| Plaintiffs/Appellees, | ) ) | |
| VS. | ) ) | C.A. No. W1998-00668-COA-R3-CV |
| **KEITH ALAN WEST**, | ) ) | |
| Defendant/Appellant. | ) ) ) | |

**FILED**

**January 13, 2000**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

From the Circuit Court of Shelby County at Memphis.
**Honorable Robert A. Lanier, Judge**

**David E. Caywood**, Memphis, Tennessee
**Stacy A. Ingle**, Memphis, Tennessee
Attorneys for Defendant/Appellant


**John R. Branson**,
**James M. Allen**,
BRANSON & BEARMAN, PLLC, Memphis, Tennessee
Attorneys for Plaintiffs/Appellees

OPINION FILED:

**AFFIRMED IN PART, REVERSED IN PART, MODIFIED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**LILLARD, J.**: (Concurs)

This is a dispute involving two minor children, Kathleen and Scott West. Defendant Keith West is the father of Kathleen and Scott while Plaintiffs Joseph and Norma Stephenson are the children's maternal grandmother and step-grandfather. Mr. West appeals an order of the trial court granting the Stephensons' request for custody of Kathleen and visitation with Scott and awarding the Stephensons child support and attorney's fees. For the reasons set forth below, we affirm in part, reverse in part, modify and remand.

### *Factual and Procedural History*

In January of 1996, Lauren West was killed in an automobile accident. Lauren was the wife of Mr. West and the mother of Kathleen and Scott. At the time of the hearing that is the subject of this appeal, Kathleen was sixteen years of age and Scott was twelve. The Stephensons are Kathleen and Scott's maternal grandmother and step-grandfather. After Lauren's death, Mr. West initially maintained a close relationship with the Stephensons. Mr. Stephenson gave Mr. West advice about buying a car and on legal matters while Mrs. Stephenson gave Mr. West advice regarding his personal life. Specifically, when Mr. West began dating a woman named Donna, Mrs. Stephenson recommended that he take his time before dating again. Mr. West thought that this advice was inappropriate. Mr. West's relationship with the Stephensons further deteriorated after an incident in June of 1996 involving the Stephensons' adult son Stewart. Mrs. Stephenson attempted to prevent Stewart from driving while intoxicated. Stewart became angry and began yelling and banging his fists on the hood of the car while Mrs. Stephenson and Scott were in the car. After this incident, Mr. West prohibited Kathleen and Scott from visiting the Stephensons at their home. Additionally, Mr. West informed the Stephensons that he no longer wanted to have any contact with them.

Mr. West's relationship with Kathleen began to break down when Mr. West married Donna in September of 1996. During October of 1996, the conflicts between Kathleen and Mr. West escalated and they began having frequent arguments. Kathleen called the Stephensons and asked if she could move in with them. The Stephensons told Kathleen that she could come over anytime but encouraged her to work things out with Mr. West. Kathleen finally left home on October 30, 1996 and moved in with the Stephensons. Since the move, Kathleen's grades have dropped dramatically.

Also after the move, Mr. West wrote a series of letters in which he renounced his relationship with Kathleen and indicated his belief that he was no longer responsible for her. Additionally, West informed Kathleen that she was no longer allowed to maintain a relationship with Scott. In August of 1997, the Stephensons removed Kathleen from her high school in Memphis and sent her to the Patterson School in North Carolina. Kathleen's poor academic performance continued and she developed serious disciplinary problems. Eventually, she was expelled from the Patterson School for serving as a lookout for some other students who were smoking marijuana. After her expulsion, Kathleen was re-enrolled at her former high school in Memphis. She withdrew from this school in January of 1999, however, expressing an intent to either obtain employment or pursue a general education degree (GED).

On a few occasions, the parties have attempted to meet in an effort to repair their relationship. For example, on one occasion, Kathleen bought gifts for Mr. West and Donna and presented them during Thanksgiving dinner. Mr. West, however, thought that these gifts were in poor taste and returned them to Kathleen. On another occasion, Kathleen made plans to have lunch with Donna but Donna cancelled the meeting because she was busy. During the period of time that Kathleen was at the Patterson School, Donna told Kathleen that she would call her regarding a possible visit. Kathleen obtained permission for the visit, but Donna never called her to make the arrangements. Finally, Mr. West and Donna invited Kathleen to visit them during the holidays. When Kathleen returned to Memphis and called them, however, she discovered that they had made plans to go out of town.

In May of 1997, the Stephensons filed a petition seeking custody of Kathleen and visitation with Scott. They later amended this petition to allege that Mr. West had abandoned Kathleen. Mr. West filed answers to both the petition and amended petition in January of 1998. After a four day hearing in May and June of 1998, the trial court issued an order granting the Stephensons' request for custody of Kathleen and visitation with Scott. The Stephensons subsequently filed a motion seeking child support, attorney's fees, expenses, and discretionary costs. Additionally, Mr. West filed a motion to alter or amend the trial court's ruling with respect to the custody of Kathleen, accompanied by an affidavit stating that he was willing to execute any document necessary to give the Stephensons the authority to make daily business and legal decisions

for Kathleen. On August 27, 1998, the trial court issued an order denying Mr. West's motion to alter or amend its ruling and an order granting the Stephensons' request for child support, attorney's fees, expenses, and discretionary costs. Mr. West filed a notice of appeal. In January of 1999, the parties appeared before a divorce referee regarding the matters of child support, attorney's fees, and expenses. Mr. West subsequently filed a petition with the trial court (1) seeking termination of the Stephensons' visitation with Scott, (2) asking the court to deny the Stephensons' request for attorney's fees, and (3) appealing the divorce referee's ruling regarding child support. After a hearing on these matters, the trial court issued an order (1) denying Mr. West's request for termination of visitation, (2) modifying the divorce referee's ruling to reflect that Mr. West's child support obligation is retroactive to June 15, 1998, (3) ordering Mr. West to pay a portion of the attorney's fees incurred by the Stephensons in connection with the June 1998 custody hearing, (4) declaring that the parties shall be responsible for their own attorney's fees incurred in connection with Mr. West's current petition, and (5) assessing costs against Mr. West.

### *Issues and Standard of Review*

The issues raised on appeal, as stated by Mr. West, are as follows:

1.   Whether the trial court erred in awarding the Stephensons custody of Kathleen West?

2.   Whether the trial court erred in ordering Mr. West to pay the Stephensons child support for Kathleen West?

3.   Whether the trial court erred in awarding the Stephensons visitation with Scott West pursuant to T.C.A. §36-6-306?

4.   Whether the trial court erred in denying Mr. West's petition to modify visitation order?

5.   Whether the trial court erred in awarding the Stephensons attorney's fees incurred in the proceedings which led to the court's order of June 15, 1998?

To the extent that these issues involve questions of fact, our review of the trial court's ruling is *de novo* with a presumption of correctness. *See* T.R.A.P. 13(d). We may not reverse these findings unless they are contrary to the preponderance of the evidence. *See, e.g., Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996); T.R.A.P. 13(d). With respect to the trial court's legal conclusions,

however, our review is *de novo* with no presumption of correctness. *See, e.g., Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen and Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999); T.R.A.P. 13(d).

## *Child Custody*[1]

Under the Tennessee Constitution, parents have a fundamental right of privacy with respect to the raising of their children. *See Bond v. McKenzie*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 579, 582 (Tenn. 1993). Accordingly, in a child custody dispute between a parent and a third party, the rights of the parent are preferred over those of the third party, even when the third party is the child's grandparent. *See Doles v. Doles*, 848 S.W.2d 656, 660 (Tenn. Ct. App. 1992); *Bush v. Bush*, 684 S.W.2d 89, 93-94 (Tenn. Ct. App. 1984).[2] This right of parental privacy generally may not be disturbed unless the parent has been shown to be unfit,[3] *see Doles*, 848 S.W.2d at 660; *Henderson v. Mabry*, 838 S.W.2d 537, 540 (Tenn. Ct. App. 1992); *Bush*, 684 S.W.2d at 93-94; *Cooper v. Cooper*, 673 S.W.2d 152, 153 (Tenn. Ct. App. 1984), or unless the court finds that the child would be subject to the danger of substantial harm if in the custody of his or her parent,[4] *see Petrosky v. Keene*, 898 S.W.2d 726, 728 (Tenn. 1995); *Bond*, 896 S.W.2d at 548; *Hawk*, 855 S.W.2d at 577, 579, 582; *Webb v. Wilson*, 980 S.W.2d 372, 375 (Tenn. Ct. App. 1998). Only then may the court apply the comparative fitness test to determine whether it is in the child's best interests to be in the custody of the parent or, rather, whether the best interests

---

[1]During the pendency of this appeal, Kathleen reached the age of majority. Thus, as a practical matter, the custody of Kathleen is no longer at issue. We nevertheless address this matter, however, because it affects our review of the trial court's ruling with respect to the issue of child support.

[2]This preference in favor of a parent in such cases is subordinate, however, to the welfare and best interests of the child, which are the primary factors that the court must consider. *See Doles*, 848 S.W.2d at 661.

[3]The trial court specifically found that Mr. West was not an unfit parent.

[4]With respect to this danger of harm, the court stated as follows:

> If, therefore, a practical abandonment which might support a termination of the parent-child relationship exists, can it be said that no "substantial harm" will occur to the child by continuing the abnormal relationship? In the opinion of the court, it cannot. If Petitioners, upon whom circumstances have thrust the responsibility for Kathleen, do not have the power to make the necessary daily business and legal decisions for her care, she will be subjected to the threat of substantial harm.

of the child demand that he or she should be placed in the custody of the third party. *See Petrosky*, 898 S.W.2d at 728; *Bond*, 896 S.W.2d at 548; *Hawk*, 855 S.W.2d at 579-80; *Webb*, 980 S.W.2d at 375.

In *Henderson v. Mabry*, 838 S.W.2d 537 (Tenn. Ct. App. 1992), this Court recognized a narrow exception to the general rule that a finding of parental unfitness or substantial harm is required before a court may place a child in the custody of a third party rather than in the custody of the child's parent. At the time of their divorce in 1985, Gary and Barbara Mabry agreed that their two minor children, ages four and seven, would remain in the custody of Ms. Mabry. *See id.* at 538. Following the divorce, Ms. Mabry and the children moved into the home of David Henderson, whom Ms. Mabry married in 1989. *See id.* When Ms. Mabry died in 1990, Mr. Henderson filed a petition seeking custody of the children, which was contested by Mr. Mabry. *See id.* After a hearing on the matter, the trial court determined that the evidence had failed to show that Mr. Mabry is an unfit parent but nevertheless awarded "absolute custody, care and control" of the children to Mr. Henderson. *See id.* at 539, 540. On appeal, this Court agreed with the trial court's finding regarding parental fitness and stated that "the children should be entrusted to the custody of [Mr. Mabry] unless exigent and compelling circumstances require otherwise." *Id.* at 540. We then concluded as follows:

> It is uncontroverted that, for six years, the children have lived in the home of David D. Henderson, who has been a good step-father to them, and that there is a bond of affection, trust and dependence between the children and David D. Henderson, which is especially important to the children following the tragic loss of their mother.
>
> This Court concurs with the conclusion of the Trial Court that, under the circumstances, it would be injurous to the children to remove them at this time from the familiar and favorable environment which they have occupied for six years.
>
> . . . .
>
> In conformity with the foregoing, the judgment of the Trial Court in respect to custody is modified to delete therefrom the words "absolute custody, care and control", and to substitute therefor the words, "temporary custody" and to substitute the word "entrusted" for the word, "awarded". The intent of this modification is to assure full consideration of entrusting custody of the children to their natural father so long as he is a fit custodian and when the present exigent circumstances no longer require custody in another.

*Id.* at 540-41.

In the instant case, Mr. West wrote a series of letters expressing his belief that he no longer had a relationship with Kathleen and that she was no longer welcome in his home. These letters provide in pertinent part as follows:

[December 6, 1996 letter to Kathleen]

> For many reasons that won't be possible given the current state of affairs. Your presence alone is uncomfortable and disrupting to them all.
>
> . . . .
>
> . . . Up until you wrote that letter, Donna was still wanting to try and get you back home, but no more. . . .
>
> . . . .
>
> . . . Also, I'd appreciate it if you don't come into the house anymore without either Donna or I here. We'll be instructing Jennifer and Mrs. Doris to not let you in.

[December 6, 1996 letter to the Stephensons]

> However, as I told her the night she left - once she walked out the door, she wasn't coming back.

[March 2, 1997 letter to Kathleen]

> I've really had three choices for some time now - to leave you there, to remove you and send you to a place like French Camp, or to bring you back home. The last was really not an option, as I'm not going to put the rest of the family here through what happened the night you left again. . . .
>
> . . . .
>
> . . . I'm going to be sending Joe and Norma a medical release form that will allow then [sic] to take you wherever they want to. I really

don't care anymore, when or where you go.

[March 2, 1997 letter to the Stephensons]

These will be your problems to deal with. Feel free to take her where you will, buy her what you want, let her do whatever she wants.

. . . .

Driving. I'm going to check on the liability issues here, but once she gets to driving age I want to make sure that her insurance and car titling is such that I am not under any liability. Bottom line, she will be your total responsibility, both to get the car, and insuring her. If I have ANY legal liability, I will not allow her to drive. So, I'll send what my exact requirements are on this before I'll allow her to start driving.

College. Should she go to college, I will not pay for any of it.

Social Security. Once she turns 18 this account will be hers. Until then, it will remain in the account, as she clearly has no need of money. The account is at NationsBank, and all monies are automatically deposited.

Medical. I will continue to have her under my medical plan, until she is 18, at which point she's on her own. Along with the medical release, I'll also be sending her medical card, which outlines all her insurance stuff. Any out-of-pocket expenses will be yours to handle, regardless of the amount.

[May 4, 1997 letter to Kathleen]

We plan on leaving in July. I saw no reason to notify you until now, as I felt no obligation to, as you really aren't part of this family anymore.

Your grades. . . . No point in saying much on this - I just hope you realize what you're doing. I think it's important that you understand that I will not be there to bail you out should you do poorly. . . .

. . . .

. . . The night you left and went to Joe and Norma's, I was no longer responsible for you, or obligated to you, in any way. However, I tried for 6 months to keep some semblance of direction and discipline for you, but finally gave this up as a futile effort. You will NEVER know how much pain I went through during that time in trying to keep some hold on you, in the hopes you would return, but it finally got too much for me to deal with, so I finally decided to cut you loose completely. I finally have some peace now, and don't worry about you anymore, as I finally realized that you chose the life you're leading, and turned your back on me.

Unfortunately, I was again thrust into having to deal with your actions by Joe and Norma, when they insisted I take you back on Friday night. I want to make sure you know that I emphatically said I would not take you back . . . .

[May 4, 1997 letter to the Stephensons]

Any options that have to be considered are yours, not mine. You and Norma caused this situation, you'll have to deal with it. I will not. Whatever problems she causes, they're yours to deal with - she's in your care, not mine. If you choose to put her in "Juvenile Court", as you emphatically mentioned last night - then that's your decision to do so. Next problem that arises from her that you have a hard time dealing with - don't call me. I'll just hang up on you again. . . .

. . . .

Just to reiterate a point I made a couple of months ago . . . I will not pay for anything regarding Kathleen. She is totally on her own. . . .

. . . .

Since I'm moving out-of-state this summer, I'll be removing Kathleen from my medical insurance. I'm giving you a head's up so that you can obtain insurance for her. I'll probably remove her at the end of June.

[May 27, 1997 letter to Mr. Stephenson]

This is a reminder - I will be dropping Kathleen from all my insurance's [sic] in June. This includes dental, medical, AD&D, and life.

At trial, Mr. West testified that in order for Kathleen to return to his home, she must satisfy a number of conditions including showing remorse, obtaining help, and working on her problems. When asked whether he could conceive of any way that Kathleen could return to his residence, Mr. West responded that he could not. Additionally, Kathleen testified as follows:

Q. Your dad says words to the effect of if you initiate efforts to reconcile and you go get counseling and accept responsibility and show remorse, then maybe you can gradually be readmitted into the family. Do you think that's going to work?

A. No.

Q. Why not?

A.      Because it's not just all my fault.

Q.      What would you do if you were told you could move back to your dad's house?

A.      I wouldn't – I don't think I would go.


On appeal, the Stephensons argue that there are "exigent and compelling circumstances" in the case at bar warranting the application of the exception recognized in **Henderson**. We agree. As evidenced by the letters and testimony discussed above, Mr. West renounced his relationship with and obligations to Kathleen. At the time of trial, he expressed a desire to reconcile with Kathleen, but placed a number of conditions on this reconciliation. Kathleen was unwilling to comply with these conditions and doubted that reconciliation was possible. Thus, the trial court was confronted with an impossible situation. It could have ordered that Kathleen be returned to the home of Mr. West. Mr. West candidly stated, however, that Kathleen was not welcome in his home unless she was willing to satisfy certain conditions with which Kathleen had refused to comply. Instead, the trial court devised a temporary custody arrangement similar to the one endorsed in **Henderson**, stating that "for the present, in this unique set of circumstances, custody must be placed where responsibility already lies - with Petitioners" The trial court's ruling recognizes the practical problems with returning Kathleen to Mr. West's home. Additionally, by using language suggesting that the custody arrangement is temporary one, the court does not preclude the possibility that, in the event of a future reconciliation, Kathleen may return to Mr. West's home. Because we find that this is an appropriate case in which to apply the "exigent and compelling circumstances" exception recognized in **Henderson**, the trial court's ruling with respect to the custody of Kathleen is affirmed.


### Child Support


Mr. West argues on appeal that the trial court erred in ordering him to pay child support to the Stephensons. We disagree. Under Tennessee law, a parent has a duty to support his or her minor child.[5] **See State ex rel. Grant v. Prograis**, 979 S.W.2d 594, 600-01 (Tenn. Ct. App.

_____

[5]Specifically, the duration of a parent's support obligation is explained as follows:

Parents shall continue to be responsible for the support of each child for whom

1997)(citing **Smith v. Gore**, 728 S.W.2d 738, 750 (Tenn. 1987); **Hall v. Jordan**, 227 S.W.2d 35, 39 (Tenn. 1950); Tenn. Code Ann. § 31-11-102 (1996)). Thus, Mr. West had an obligation to support Kathleen regardless of whether she was in his custody or in the custody of the Stephensons. When a parent fails to support his or her child and such support is provided to the child by a third party, the third party is entitled to reimbursement from the parent under the theory of implied contract. **See Prograis**, 979 S.W.2d at 601. It follows, then, that the Stephenson's are entitled to reimbursement for the support that they provided to Kathleen while she was in their care.

The divorce referee initially ruled that Mr. West became obligated to pay child support to the Stephensons on October 30, 1996, the date that Kathleen left home and began residing with the Stephensons. The trial court modified this ruling, however, stating simply that "[i]n view of the peculiar circumstances of this case, this court is of the opinion that child support should not begin until the date of this court's order in this case, which was June 15, 1998." We find no evidence in the record or legal justification to support this modification. Mr. West ceased his support of Kathleen when she moved out of his home on October 30, 1996, not when the trial court entered its order on June 15, 1998. Likewise, the Stephensons began supporting Kathleen on October 30, 1996, not June 15, 1998. We therefore modify the trial court's ruling to reflect that the ruling of the divorce referee regarding child support is reinstated and that Mr. West's obligation to pay support to the Stephensons is retroactive to October 30, 1996, the date on which Kathleen began residing with them.

*Visitation*

As stated above, the trial court granted the Stephensons' petition for visitation with Scott, specifying that the Stephensons shall have no less than four hours of visitation during every other month. The court explained its ruling as follows:

---

they are responsible after the child reaches eighteen (18) years of age if the child is in high school. The duty of support shall continue until the child graduates from high school or the class of which the child is a member when the child attains eighteen (18) years of age graduates, whichever occurs first.

Tenn. Code Ann. § 34-11-102(b) (1996).

Under the law of this state, there appears to be a presumption that permanent loss of the relationship with grandparents would be a "severe emotional and psychological blow to the child . . . and substantial danger to the welfare of the child." T.C.A. § 36-6-307 (a). Unlike the case of custody of a child, the law of this state does not demand that visitation be left to the discretion of the single parent and, where the court finds it in the best interest of the child to have some visitation with the grandparents, it may be permitted. The court has considered the factors set forth in the statute [T.C.A. § 36-6-307 (d)(2)] and finds that some minimal visitation with the grandparents will be in the best interest of the child.

As an initial matter, we find that the trial court's reliance on section 36-6-307(a) of the Tennessee Code Annotated is misplaced. Section 36-6-307 is entitled "Visitation rights of parents adopting relative or stepparent." Subsection (a) of this provision applies only "[i]f a relative or a stepparent adopts a child." Tenn. Code Ann. § 36-6-307(a) (Supp. 1999). In the instant case, Scott has not been adopted by Mr. West's current wife Donna or by any other relative. Thus, the rebuttable presumption of substantial danger set forth in section 36-6-307(a) does not apply. Rather, the present case is governed by section 36-6-306 of the Tennessee Code Annotated, which provides in pertinent part as follows:

(a) If:
(1) Either the father or mother of an unmarried minor child is deceased;
(2) The child's father and mother are divorced or legally separated;
(3) The child's father or mother has been missing for not less than six (6) months; or
(4) The court of another state has ordered grandparent visitation; then, the parents of such deceased person or the parents of either of such divorced or separated persons or the parents of the missing person may be granted reasonable visitation rights to the child during its minority by a court of competent jurisdiction upon a finding that such visitation rights are in the best interests of the minor child, based on the factors in § 36-6-307(d)(2).

Tenn. Code Ann. § 36-6-306(a) (Supp. 1999).

Mr. West contends on appeal that the trial court's ruling constitutes an unconstitutional infringement on his right to parental privacy. We agree. In *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993), the Tennessee Supreme Court considered the constitutionality of section 36-6-301 of the Tennessee Code Annotated, which is the predecessor to sections 36-6-306 and 36-6-

307. *See id.* at 575. Section 36-6-301, like section 36-6-306, allowed a court to order reasonable visitation with grandparents if it finds that such visitation is in the child's best interests. *See id.* at 576. After discussing a number of cases involving the rights of parents with respect to their children, the court in *Hawk* concluded as follows:

> We hold that Article I, Section 8 of the Tennessee Constitution protects the privacy interest of these parents in their child-rearing decisions, so long as their decisions do not substantially endanger the welfare of their children. Absent some harm to the child, we find that the state lacks a sufficiently compelling justification for interfering with this fundamental right. When applied to married parents who have maintained continuous custody of their children and have acted as fit parents, we conclude that court interference pursuant to T.C.A. § 36-6-301 constitutes an unconstitutional invasion of privacy rights under the Tennessee Constitution.

*Id*. at 582. Thus, *Hawk* clearly established that, when a child's parents are married and neither is unfit, a court may not order grandparent visitation without first finding that a lack of visitation would result in substantial harm to the child. In a number of cases following *Hawk*, the courts of this state have recognized that the rule set forth in *Hawk* is equally applicable to cases in which the child is not part of an intact nuclear family. *See Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn. 1995)(paternal grandparents seeking visitation after father's parental rights terminated, mother remarried, and step-father adopted child); *Hilliard v. Hilliard*, No. 02A01-9609-CH-00230, 1997 WL 61510, at *4 (Tenn. Ct. App. Feb. 14, 1997)(maternal grandparent seeking visitation when child's parents were divorced and father was granted custody); *McVay v. Blen*, No. 02A01-9508-JV-00183, 1996 WL 729911, at *3 (Tenn. Ct. App. Dec. 19, 1996)(paternal grandparents seeking visitation with child born out of wedlock but subsequently legitimated by father); *Floyd v. McNeely*, No. 02A01-9408-CH-00187, 1995 WL 390954, at *4 (Tenn. Ct. App. July 5, 1995)(paternal grandmother seeking visitation where parents were divorced and father subsequently died).

Consistent with the aforementioned authority, we find that, before making a determination regarding whether visitation with the Stephensons is in Scott's best interest, the trial court was required to consider whether the failure to visit with the Stephensons would subject Scott to substantial harm. Although the trial court noted the rebuttable presumption of substantial harm set forth in section 36-6-307(a), which for the reasons stated above is inapplicable, the court failed

to make any finding regarding the existence or non-existence of substantial harm under the facts of the case at bar.[6] Thus, we reverse the portion of the trial court's order granting visitation to the Stephensons and remand the cause so that the court may determine whether a failure to visit with the Stephensons would result in substantial harm to Scott and, if so, whether it is in Scott's best interests that the Stephensons' request for visitation be granted.[7]

### *Attorney's Fees*

Finally, Mr. West contends that the trial court erred in requiring him to pay a portion of the attorney's fees that the Stephensons incurred in connection with their petition for custody and visitation. Specifically, Mr. West argues that this award of attorney's fees is inequitable because there is a significant income disparity between the parties. The court's ruling with respect to this matter is as follows:

> Evidence was presented, and the court hereby finds, that there is a great disparity in the incomes of the grandparents and of the defendant. Defendant's average income is approximately $98,000.00 per year and he is holding in reserve some $20,000.00 in cash pending the outcome of this appeal. He has a $90,000.00 equity in his new home in Texas. Those are the only assets of substance which he presently has. The grandparents have a net worth of approximately $2.8 million dollars. The step-grandfather's income was listed at approximately $171,000.00. Attorney's fees in domestic relations disputes involving children are generally awarded on the theory of support for the child. They are awarded to insure that the child will be able to have access to the court, through his or her adult protectors, and will not be denied the protection of the court due to poverty. Neither party in this suit is without resources to obtain legal representation. The grandparents primarily prevailed at the custody hearing in 1998. To the extent that the court is asked to rule on the attorney's fees for the custody hearing, and to the extent that the court has not previously ruled on them, the attorney's fees should be borne in proportion to the incomes mentioned above and in the ratio to

---

[6]This omission is understandable, however, given that section 36-6-306 requires only a determination regarding the best interests of the child. To the extent that section 36-6-306 does not require a finding of substantial harm before the court may engage in the best interests analysis, we find that the statute is unconstitutional. This finding is identical to the holding of *Ellison v. Ellison*, 994 S.W.2d 623 (Tenn. Ct. App. 1998). The parties disagree regarding whether *Ellison* may be retroactively applied to the case at bar. Because our decision in this case is reached independently of *Ellison*, however, we find it unnecessary to address the issue of retroactivity.

[7]In light of our reversal of the trial court's order granting the Stephensons' request for visitation with Scott, we find it unnecessary to address whether the trial court erred in denying Mr. West's petition to modify this order.

which they bear to each other.

In cases involving child custody, the trial court is authorized to award attorney's fees under section 36-5-103(c) of the Tennessee Code Annotated.[8] *See, e.g., Placencia v. Placencia*, 3 S.W.3d 497, 504 (Tenn. Ct. App. 1999). The allowance of attorney's fees in such cases is largely within the sound discretion of the trial court. *See, e.g., Smith v. Smith*, 984 S.W.2d 606, 610 (Tenn. Ct. App. 1997)(citing *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992)). Absent an abuse of discretion, reviewing courts will not interfere with a trial court's ruling regarding this matter. *See id.* In the instant case, the trial court considered the relative incomes and assets of the parties and, accordingly, ordered Mr. West to pay only a portion of the Stephensons' attorney's fees. Because we find no abuse of discretion on the part of the trial court, we affirm the court's ruling regarding attorney's fees.

### *Conclusion*

Based on the foregoing, the trial court's ruling with respect to the matter of child support is modified to reflect that Mr. West's obligation to reimburse the Stephensons is retroactive to October 30, 1996. Additionally, the trial court's ruling with respect to the Stephensons' request for visitation with Scott is reversed. In all other respects, the ruling of the trial court is affirmed. Finally, the cause is remanded so that the trial court may determine the total amount of child support owed to the Stephensons by Mr. West and further to determine whether a lack of visitation with the Stephensons would result in substantial harm to Scott. Costs on appeal are assessed one-half against Mr. West and one-half against the Stephensons, for which execution may issue if necessary.

_____

FARMER, J.

_____

[8]This provision does not limit recovery of attorney's fees to divorcing spouses who are parents of the child, but also includes "other person[s] to whom custody of the child, or children, is awarded." Tenn. Code Ann. § 36-5-103(c) (Supp. 1999). Additionally, the statute specifically applies to attorney's fees incurred "in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children of the parties." Tenn. Code Ann. § 36-5-103(c) (Supp. 1999). The Stephensons are persons to whom custody of Kathleen was awarded. Further, the Stephensons incurred attorney's fees in an action concerning the custody of Kathleen. Thus, we think that section 36-5-103(c) is applicable to the case at bar.

CRAWFORD, P.J., W.S.


LILLARD, J.